(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ROSEMOND *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 12–895.   Argued November 12, 2013—Decided March 5, 2014

Petitioner Justus Rosemond took part in a drug deal in which either he or one of his confederates fired a gun.  Because the shooter's identity was disputed, the Government charged Rosemond with violating 18 U. S. C. §924(c) by using or carrying a gun in connection with a drug trafficking crime, or, in the alternative, aiding and abetting that offense under 18 U. S. C. §2.  The trial judge instructed the jury that Rosemond was guilty of aiding and abetting the §924(c) offense if he (1) "knew his cohort used a firearm in the drug trafficking crime" and (2) "knowingly and actively participated in the drug trafficking crime."  This deviated from Rosemond's proposed instruction that the jury must find that he acted intentionally "to facilitate or encourage" the firearm's use, as opposed to merely the predicate drug offense. Rosemond was convicted, and the Tenth Circuit affirmed, rejecting his argument that the District Court's aiding and abetting instructions were erroneous.

*Held*:

   1. The Government establishes that a defendant aided and abetted a §924(c) violation by proving that the defendant actively participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission.  Pp. 5–16.

      (a) The federal aiding and abetting statute, which derives from common-law standards for accomplice liability, has two components. A person is liable under §2 only if he (1) takes an affirmative act in furtherance of the underlying offense (2) with the intent to facilitate that offense's commission.  Pp. 5–6.

      (b) The first question is whether Rosemond's conduct was sufficient to satisfy the affirmative act requirement of aiding and abet-

ting.  Section 924(c) has two elements: a drug deal or violent crime, and using or carrying a firearm in connection with that crime.  The instructions permitted the jury to convict Rosemond of aiding and abetting even if he facilitated only the drug element, and not the gun element, of the §924(c) offense.  Those instructions were correct.  The common law imposed aiding and abetting liability on a person who facilitated any element of a criminal offense, even if he did not facilitate all elements.  That principle continues to govern §2.  See, *e.g.*, *United States* v. *Johnson*, 319 U. S. 503, 515.  Pp. 6–11.

(c) In addition to conduct extending to some part of the crime, aiding and abetting requires intent extending to the whole crime.  The defendant must not just associate himself with the venture, but also participate in it as something that he wishes to bring about and seek by his actions to make it succeed.  *Nye & Nissen* v. *United States*, 336 U. S. 613, 619.  That requirement is satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense.  See *Pereira* v. *United States*, 347 U. S. 1, 12.  An active participant in a drug transaction has the intent needed to aid and abet a §924(c) violation when he knows that one of his confederates will carry a gun.  This must be advance knowledge—meaning, knowledge at a time when the accomplice has a reasonable opportunity to walk away.  Pp. 11–16.

2. The trial court's jury instructions were erroneous because they failed to require that Rosemond knew in advance that one of his cohorts would be armed.  In telling the jury to consider merely whether Rosemond "knew his cohort used a firearm," the court did not direct the jury to determine when Rosemond obtained the requisite knowledge—*i.e.*, to decide whether Rosemond knew about the gun in sufficient time to withdraw from the crime.  The case is remanded to permit the Tenth Circuit to address whether this objection was properly preserved and whether any error was harmless.  Pp. 16–19.

695 F. 3d 1151, vacated and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined, and in which SCALIA, J., joined in all but footnotes 7 and 8.  ALITO, J., filed an opinion concurring in part and dissenting in part, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–895

_____

## JUSTUS C. ROSEMOND, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[March 5, 2014]

JUSTICE KAGAN delivered the opinion of the Court.*

A federal criminal statute, §924(c) of Title 18, prohibits "us[ing] or carr[ying]" a firearm "during and in relation to any crime of violence or drug trafficking crime." In this case, we consider what the Government must show when it accuses a defendant of aiding or abetting that offense. We hold that the Government makes its case by proving that the defendant actively participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission. We also conclude that the jury instructions given below were erroneous because they failed to require that the defendant knew in advance that one of his cohorts would be armed.

I

This case arises from a drug deal gone bad. Vashti Perez arranged to sell a pound of marijuana to Ricardo Gonzales and Coby Painter. She drove to a local park to make the exchange, accompanied by two confederates,

_____

*JUSTICE SCALIA joins all but footnotes 7 and 8 of this opinion.

Ronald Joseph and petitioner Justus Rosemond. One of those men apparently took the front passenger seat and the other sat in the back, but witnesses dispute who was where. At the designated meeting place, Gonzales climbed into the car's backseat while Painter waited outside. The backseat passenger allowed Gonzales to inspect the marijuana. But rather than handing over money, Gonzales punched that man in the face and fled with the drugs. As Gonzales and Painter ran away, one of the male passengers—but again, which one is contested—exited the car and fired several shots from a semiautomatic handgun. The shooter then re-entered the vehicle, and all three would-be drug dealers gave chase after the buyers-turned-robbers. But before the three could catch their quarry, a police officer, responding to a dispatcher's alert, pulled their car over. This federal prosecution of Rosemond followed.[1]

The Government charged Rosemond with, *inter alia*, violating §924(c) by using a gun in connection with a drug trafficking crime, or aiding and abetting that offense under §2 of Title 18. Section 924(c) provides that "any person who, during and in relation to any crime of violence or drug trafficking crime[,] . . . uses or carries a firearm," shall receive a five-year mandatory-minimum sentence, with seven- and ten-year minimums applicable, respectively, if the firearm is also brandished or discharged. 18 U. S. C. §924(c)(1)(A). Section 2, for its part, is the federal aiding and abetting statute: It provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal."

Consistent with the indictment, the Government prose-

———————

[1] The Government agreed not to bring charges against the other four participants in the narcotics deal in exchange for their giving truthful testimony against Rosemond. See 2 Record 245, 272, 295–296, 318.

cuted the §924(c) charge on two alternative theories. The Government's primary contention was that Rosemond himself used the firearm during the aborted drug transaction. But recognizing that the identity of the shooter was disputed, the Government also offered a back-up argument: Even if it was Joseph who fired the gun as the drug deal fell apart, Rosemond aided and abetted the §924(c) violation.

The District Judge accordingly instructed the jury on aiding and abetting law. He first explained, in a way challenged by neither party, the rudiments of §2. Under that statute, the judge stated, "[a] person who aids or abets another to commit an offense is just as guilty of that offense as if he committed it himself." App. 195. And in order to aid or abet, the defendant must "willfully and knowingly associate[ ] himself in some way with the crime, and . . . seek[ ] by some act to help make the crime succeed." *Id*., at 196. The judge then turned to applying those general principles to §924(c)—and there, he deviated from an instruction Rosemond had proposed. According to Rosemond, a defendant could be found guilty of aiding or abetting a §924(c) violation only if he "intentionally took some action to facilitate or encourage the use of the firearm," as opposed to the predicate drug offense. *Id*., at 14. But the District Judge disagreed, instead telling the jury that it could convict if "(1) the defendant knew his cohort used a firearm in the drug trafficking crime, and (2) the defendant knowingly and actively participated in the drug trafficking crime." *Id.,* at 196. In closing argument, the prosecutor contended that Rosemond easily satisfied that standard, so that even if he had not "fired the gun, he's still guilty of the crime." *Id*., at 158. After all, the prosecutor stated, Rosemond "certainly knew [of] and actively participated in" the drug transaction. *Ibid*. "And with regards to the other element," the prosecutor urged, "the fact is a person cannot be present and active at a drug deal

when shots are fired and not know their cohort is using a
gun. You simply can't do it." *Ibid.*

  The jury convicted Rosemond of violating §924(c) (as
well as all other offenses charged).  The verdict form was
general: It did not reveal whether the jury found that
Rosemond himself had used the gun or instead had aided
and abetted a confederate's use during the marijuana deal.
As required by §924(c), the trial court imposed a consec-
utive sentence of 120 months of imprisonment for the
statute's violation.

  The Tenth Circuit affirmed, rejecting Rosemond's argu-
ment that the District Court's aiding and abetting instruc-
tions were erroneous.[2]  The Court of Appeals acknowledged
that some other Circuits agreed with Rosemond that
a defendant aids and abets a §924(c) offense only if he
intentionally takes "some action to facilitate or encourage
his cohort's use of the firearm."  695 F. 3d 1151, 1155
(2012).[3]  But the Tenth Circuit had already adopted a
different standard, which it thought consonant with the
District Court's instructions.  See, *e.g.*, *United States* v.
*Wiseman*, 172 F. 3d 1196, 1217 (1999) (requiring that the
defendant "actively participated in the" underlying crime
and "knew [his confederate] was carrying [a] firearm").
And the Court of Appeals held that Rosemond had pre-
sented no sufficient reason for departing from that prece-
dent.  See 695 F. 3d, at 1156.

  We granted certiorari, 569 U. S. ___ (2013), to resolve

―――――――――

  [2] The Court of Appeals stated that it had to address that argument
even if the jury could have found that Rosemond himself fired the gun,
because "a conviction based on a general verdict is subject to challenge
if the jury was instructed on alternative theories of guilt and may have
relied on an invalid one."  695 F. 3d 1151, 1154 (2012) (quoting
*Hedgpeth* v. *Pulido*, 555 U. S. 57, 58 (2008) (*per curiam*)).
  [3] See, *e.g.*, *United States* v. *Rolon-Ramos*, 502 F. 3d 750, 758–759
(CA8 2007); *United States* v. *Medina-Roman*, 376 F. 3d 1, 6 (CA1 2004);
*United States* v. *Bancalari*, 110 F. 3d 1425, 1429–1430 (CA9 1997).

the Circuit conflict over what it takes to aid and abet a §924(c) offense. Although we disagree with Rosemond's principal arguments, we find that the trial court erred in instructing the jury. We therefore vacate the judgment below.

## II

The federal aiding and abetting statute, 18 U. S. C. §2, states that a person who furthers—more specifically, who "aids, abets, counsels, commands, induces or procures"— the commission of a federal offense "is punishable as a principal." That provision derives from (though simplifies) common-law standards for accomplice liability. See, *e.g.*, *Standefer* v. *United States*, 447 U. S. 10, 14–19 (1980); *United States* v. *Peoni*, 100 F. 2d 401, 402 (CA2 1938) (L. Hand, J.) ("The substance of [§2's] formula goes back a long way"). And in so doing, §2 reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission. See J. Hawley & M. McGregor, Criminal Law 81 (1899).

We have previously held that under §2 "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime." *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 181 (1994). Both parties here embrace that formulation, and agree as well that it has two components. See Brief for Petitioner 28; Brief for United States 14. As at common law, a person is liable under §2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission. See 2 W. LaFave, Substantive Criminal Law §13.2, p. 337 (2003) (hereinafter LaFave) (an accomplice is liable as a principal when he gives "assistance or encouragement . . . with the intent thereby

to promote or facilitate commission of the crime"); *Hicks* v. *United States*, 150 U. S. 442, 449 (1893) (an accomplice is liable when his acts of assistance are done "with the intention of encouraging and abetting" the crime).

The questions that the parties dispute, and we here address, concern how those two requirements—affirmative act and intent—apply in a prosecution for aiding and abetting a §924(c) offense. Those questions arise from the compound nature of that provision. Recall that §924(c) forbids "us[ing] or carr[ying] a firearm" when engaged in a "crime of violence or drug trafficking crime." See *supra,* at 2. The prosecutor must show the use or carriage of a gun; so too he must prove the commission of a predicate (violent or drug trafficking) offense. See *Smith* v. *United States*, 508 U. S. 223, 228 (1993). For purposes of ascertaining aiding and abetting liability, we therefore must consider: When does a person act to further this double-barreled crime? And when does he intend to facilitate its commission? We address each issue in turn.

A

Consider first Rosemond's account of his conduct (divorced from any issues of intent). Rosemond actively participated in a drug transaction, accompanying two others to a site where money was to be exchanged for a pound of marijuana. But as he tells it, he took no action with respect to any firearm. He did not buy or borrow a gun to facilitate the narcotics deal; he did not carry a gun to the scene; he did not use a gun during the subsequent events constituting this criminal misadventure. His acts thus advanced one part (the drug part) of a two-part incident— or to speak a bit more technically, one element (the drug element) of a two-element crime. Is that enough to satisfy the conduct requirement of this aiding and abetting charge, or must Rosemond, as he claims, have taken some act to assist the commission of the other (firearm) compo-

nent of §924(c)?

The common law imposed aiding and abetting liability on a person (possessing the requisite intent) who facilitated any part—even though not every part—of a criminal venture. As a leading treatise, published around the time of §2's enactment, put the point: Accomplice liability attached upon proof of "*[a]ny* participation in a general felonious plan" carried out by confederates. 1 F. Wharton, Criminal Law §251, p. 322 (11th ed. 1912) (hereinafter Wharton) (emphasis added). Or in the words of another standard reference: If a person was "present abetting while *any* act necessary to constitute the offense [was] being performed through another," he could be charged as a principal—even "though [that act was] *not the whole thing necessary*." 1 J. Bishop, Commentaries on the Criminal Law §649, p. 392 (7th ed. 1882) (emphasis added). And so "[w]here several acts constitute[d] together one crime, if each [was] separately performed by a different individual[,] . . . all [were] principals as to the whole." *Id.*, §650, at 392.[4] Indeed, as yet a third treatise underscored, a person's involvement in the crime could be not merely partial but minimal too: "The quantity [of assistance was] immaterial," so long as the accomplice did "*something*" to aid the crime. R. Desty, A Compendium of American Criminal Law §37a, p. 106 (1882) (emphasis added). After all, the common law maintained, every little bit helps— and a contribution to some part of a crime aids the whole.

———————

[4] The Wharton treatise gave the following example of how multiple confederates could perform different roles in carrying out a crime. Assume, Wharton hypothesized, that several persons "act in concert to steal a man's goods." Wharton §251, at 322. The victim is "induced by fraud to trust one of them[,] in the presence of [the] others[,] with the [goods'] possession." *Ibid.* Afterward, "another of the party entice[s] the owner away so that he who has the goods may carry them off." *Id.*, at 322–323. Wharton concludes: "[A]ll are guilty as principals." *Id.*, at 323.

That principle continues to govern aiding and abetting law under §2: As almost every court of appeals has held, "[a] defendant can be convicted as an aider and abettor without proof that he participated in each and every element of the offense." *United States* v. *Sigalow*, 812 F. 2d 783, 785 (CA2 1987).[5]  In proscribing aiding and abetting, Congress used language that "comprehends all assistance rendered by words, acts, encouragement, support, or presence," *Reves* v. *Ernst & Young*, 507 U. S. 170, 178 (1993)— even if that aid relates to only one (or some) of a crime's phases or elements.  So, for example, in upholding convictions for abetting a tax evasion scheme, this Court found "irrelevant" the defendants' "non-participation" in filing a false return; we thought they had amply facilitated the illegal scheme by helping a confederate conceal his assets. *United States* v. *Johnson*, 319 U. S. 503, 515, 518 (1943). "[A]ll who shared in [the overall crime's] execution," we explained, "have equal responsibility before the law, whatever may have been [their] different roles." *Id.*, at 515. And similarly, we approved a conviction for abetting mail fraud even though the defendant had played no part in mailing the fraudulent documents; it was enough to satisfy the law's conduct requirement that he had in other ways aided the deception.  See *Pereira* v. *United States*, 347 U. S. 1, 8–11 (1954).  The division of labor between two (or more) confederates thus has no significance: A strategy of "you take that element, I'll take this one"

—————

[5] See also *United States* v. *Ali*, 718 F. 3d 929, 939 (CADC 2013) ("[P]roving a defendant guilty of aiding and abetting does not ordinarily require the government to establish participation in each . . . element of the underlying offense"); *United States* v. *Arias-Izquierdo*, 449 F. 3d 1168, 1176 (CA11 2006) ("The government was not required to prove that [the defendant] participated in each element of the substantive offense in order to hold him liable as an aider and abettor"); *United States* v. *Woods*, 148 F. 3d 843, 850 (CA7 1998) ("[T]he government need not prove assistance related to every element of the underlying offense").  And so forth and so on.

would free neither party from liability.[6]

Under that established approach, Rosemond's participation in the drug deal here satisfies the affirmative-act requirement for aiding and abetting a §924(c) violation. As we have previously described, the commission of a drug trafficking (or violent) crime is—no less than the use of a firearm—an "essential conduct element of the §924(c) offense." *United States* v. *Rodriguez-Moreno*, 526 U. S. 275, 280 (1999); see *supra,* at 6. In enacting the statute, "Congress proscribed both the use of the firearm *and* the commission of acts that constitute" a drug trafficking crime. *Rodriguez-Moreno*, 526 U. S, at 281. Rosemond therefore could assist in §924(c)'s violation by facilitating either the drug transaction or the firearm use (or of course both). In helping to bring about one part of the offense (whether trafficking drugs or using a gun), he necessarily helped to complete the whole. And that ends the analysis as to his conduct. It is inconsequential, as courts applying both the common law and §2 have held, that his acts did not advance each element of the offense; all that matters is that they facilitated one component.

Rosemond argues, to the contrary, that the requisite act here "must be directed at the use of the firearm," because that element is §924(c)'s most essential feature. Brief for Petitioner 33 (arguing that "it is the firearm crime" he was really charged with aiding and abetting, "not the drug trafficking crime"). But Rosemond can provide no author-

————————

[6] Consider a hypothetical similar to *Johnson* and *Pereira* (and a modern variant of the Wharton treatise's, see n. 4, *supra*). Suppose that as part of a kidnapping scheme, one accomplice lures the victim into a car under false pretenses; another drives the vehicle; a third allows the use of her house to hold the victim captive; and still a fourth keeps watch outside to divert potential witnesses. None would have personally completed, or even assisted with, all elements of the offense. See, *e.g.*, *United States* v. *Cervantes-Blanco*, 504 F. 3d 576, 580 (CA5 2007) (listing elements). But (if they had the requisite intent) all would be liable under §2.

ity for demanding that an affirmative act go toward an element considered peculiarly significant; rather, as just noted, courts have never thought relevant the importance of the aid rendered. See *supra,* at 7–8. And in any event, we reject Rosemond's premise that §924(c) is somehow more about using guns than selling narcotics. It is true enough, as Rosemond says in support of that theory, that §924(c) "establishes a separate, freestanding offense that is 'distinct from the underlying [drug trafficking crime].'" Brief for Petitioner 32 (quoting *Simpson* v. *United States*, 435 U. S. 6, 10 (1978)). But it is just as true that §924(c) establishes a freestanding offense distinct from any that might apply just to using a gun—say, for discharging a firearm in a public park. That is because §924(c) is, to coin a term, a combination crime. It punishes the temporal and relational conjunction of two separate acts, on the ground that together they pose an extreme risk of harm. See *Muscarello* v. *United States*, 524 U. S. 125, 132 (1998) (noting that §924(c)'s "basic purpose" was "to combat the dangerous combination of drugs and guns"). And so, an act relating to drugs, just as much as an act relating to guns, facilitates a §924(c) violation.

Rosemond's related argument that our approach would conflate two distinct offenses—allowing a conviction for abetting a §924(c) violation whenever the prosecution shows that the defendant abetted the underlying drug trafficking crime—fares no better. See Brief for Petitioner 38. That is because, as we will describe, an aiding and abetting conviction requires not just an act facilitating one or another element, but also a state of mind extending to the entire crime. See *infra,* at 11. And under that rule, a defendant may be convicted of abetting a §924(c) violation only if his intent reaches beyond a simple drug sale, to an armed one. Aiding and abetting law's intent component— to which we now turn—thus preserves the distinction between assisting the predicate drug trafficking crime and

assisting the broader §924(c) offense.

## B

Begin with (or return to) some basics about aiding and abetting law's intent requirement, which no party here disputes. As previously explained, a person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission. See *supra,* at 5–6. An intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged—so here, to the full scope (predicate crime plus gun use) of §924(c). See, *e.g.*, 2 LaFave §13.2(c); W. Clark & W. Marshall, Law of Crimes, §187, pp. 251–253 (2d ed. 1905); ALI, Model Penal Code §2.06 Comment, p. 306 (1985).[7] And the canonical formulation of that needed state of mind—later appropriated by this Court and oft-quoted in both parties' briefs—is Judge Learned Hand's: To aid and abet a crime, a defendant must not just "in some sort associate himself with the venture," but also "participate in it as in something that he wishes to bring about" and "seek by his action to make it succeed." *Nye & Nissen* v. *United States*, 336 U. S. 613, 619 (1949) (quoting *Peoni*, 100 F. 2d, at 402; see Brief for Petitioner 20, 28, 41; Brief for United States 14, 51.

We have previously found that intent requirement satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances consti-

---

[7] Some authorities suggest an exception to the general rule when another crime is the "natural and probable consequence" of the crime the defendant intended to abet. See, *e.g.*, 2 LaFave §13.3(b), at 356 (citing cases); but see *id.*, §13.3 ("Under the better view, one is not an accomplice to a crime merely because . . . that crime was a natural and probable consequence of another offense as to which he is an accomplice"). That question is not implicated here, because no one contends that a §924(c) violation is a natural and probable consequence of simple drug trafficking. We therefore express no view on the issue.

tuting the charged offense. In *Pereira*, the mail fraud case discussed above, we found the requisite intent for aiding and abetting because the defendant took part in a fraud "know[ing]" that his confederate would take care of the mailing. 347 U. S., at 12; see *supra,* at 8. Likewise, in *Bozza* v. *United States*, 330 U. S. 160, 165 (1947), we upheld a conviction for aiding and abetting the evasion of liquor taxes because the defendant helped operate a clandestine distillery "know[ing]" the business was set up "to violate Government revenue laws." And several Courts of Appeals have similarly held—addressing a fact pattern much like this one—that the unarmed driver of a getaway car had the requisite intent to aid and abet armed bank robbery if he "knew" that his confederates would use weapons in carrying out the crime. See, *e.g.*, *United States* v. *Akiti*, 701 F. 3d 883, 887 (CA8 2012); *United States* v. *Easter*, 66 F. 3d 1018, 1024 (CA9 1995). So for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission.[8]

The same principle holds here: An active participant in a drug transaction has the intent needed to aid and abet a §924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one. In so doing, he has chosen (like the abettors in *Pereira* and *Bozza* or the driver in an armed robbery) to align himself

---

[8] We did not deal in these cases, nor do we here, with defendants who incidentally facilitate a criminal venture rather than actively participate in it. A hypothetical case is the owner of a gun store who sells a firearm to a criminal, knowing but not caring how the gun will be used. We express no view about what sort of facts, if any, would suffice to show that such a third party has the intent necessary to be convicted of aiding and abetting.

with the illegal scheme in its entirety—including its use of a firearm. And he has determined (again like those other abettors) to do what he can to "make [that scheme] succeed." *Nye & Nissen*, 336 U. S., at 619. He thus becomes responsible, in the typical way of aiders and abettors, for the conduct of others. He may not have brought the gun to the drug deal himself, but because he took part in that deal knowing a confederate would do so, he intended the commission of a §924(c) offense—*i.e.,* an armed drug sale.

For all that to be true, though, the §924(c) defendant's knowledge of a firearm must be advance knowledge—or otherwise said, knowledge that enables him to make the relevant legal (and indeed, moral) choice. When an accomplice knows beforehand of a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an *armed* offense. But when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime. And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun. As even the Government concedes, an unarmed accomplice cannot aid and abet a §924(c) violation unless he has "foreknowledge that his confederate will commit the offense with a firearm." Brief for United States 38; see also *infra,* at 15–17. For the reasons just given, we think that means knowledge at a time the accomplice can do something with it—most notably, opt to walk away.[9]

——————

[9] Of course, if a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge. In any criminal case, after all, the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a

Both parties here find something to dislike in our view of this issue. Rosemond argues that a participant in a drug deal intends to assist a §924(c) violation only if he affirmatively desires one of his confederates to use a gun. See Reply Brief 8–11. The jury, Rosemond concedes, could infer that state of mind from the defendant's advance knowledge that the plan included a firearm. See Tr. of Oral Arg. 5. But according to Rosemond, the instructions must also permit the jury to draw the opposite conclusion— that although the defendant participated in a drug deal knowing a gun would be involved, he did not specifically want its carriage or use. That higher standard, Rosemond claims, is necessary to avoid subjecting persons of different culpability to the same punishment. Rosemond offers as an example an unarmed driver assisting in the heist of a store: If that person spent the drive "trying to persuade [his confederate] to leave [the] gun behind," then he should be convicted of abetting shoplifting, but not armed robbery. Reply Brief 9.

We think not. What matters for purposes of gauging intent, and so what jury instructions should convey, is that the defendant has chosen, with full knowledge, to participate in the illegal scheme—not that, if all had been left to him, he would have planned the identical crime. Consider a variant of Rosemond's example: The driver of a getaway car wants to help rob a convenience store (and argues passionately for that plan), but eventually accedes when his confederates decide instead to hold up a national bank. Whatever his original misgivings, he has the requisite intent to aid and abet *bank* robbery; after all, he put aside those doubts and knowingly took part in that more dangerous crime. The same is true of an accomplice who knowingly joins in an armed drug transaction—regardless whether he was formerly indifferent or even resistant to

———

crime's commission.

using firearms. The law does not, nor should it, care whether he participates with a happy heart or a sense of foreboding. Either way, he has the same culpability, because either way he has knowingly elected to aid in the commission of a peculiarly risky form of offense.

A final, metaphorical way of making the point: By virtue of §924(c), using a firearm at a drug deal ups the ante. A would-be accomplice might decide to play at those perilous stakes. Or he might grasp that the better course is to fold his hand. What he should not expect is the capacity to hedge his bets, joining in a dangerous criminal scheme but evading its penalties by leaving use of the gun to someone else. Aiding and abetting law prevents that outcome, so long as the player knew the heightened stakes when he decided to stay in the game.

The Government, for its part, thinks we take too strict a view of when a defendant charged with abetting a §924(c) violation must acquire that knowledge. As noted above, the Government recognizes that the accused accomplice must have "foreknowledge" of a gun's presence. Brief for United States 38; see *supra,* at 13. But the Government views that standard as met whenever the accomplice, having learned of the firearm, continues any act of assisting the drug transaction. See Brief for United States 48. According to the Government, the jury should convict such a defendant even if he became aware of the gun only after he realistically could have opted out of the crime.

But that approach, we think, would diminish too far the requirement that a defendant in a §924(c) prosecution must intend to further an *armed* drug deal. Assume, for example, that an accomplice agrees to participate in a drug sale on the express condition that no one brings a gun to the place of exchange. But just as the parties are making the trade, the accomplice notices that one of his confederates has a (poorly) concealed firearm in his jacket. The Government would convict the accomplice of aiding

and abetting a §924(c) offense if he assists in completing the deal without incident, rather than running away or otherwise aborting the sale. See Tr. of Oral Arg. 40. But behaving as the Government suggests might increase the risk of gun violence—to the accomplice himself, other participants, or bystanders; and conversely, finishing the sale might be the best or only way to avoid that danger. In such a circumstance, a jury is entitled to find that the defendant intended only a drug sale—that he never intended to facilitate, and so does not bear responsibility for, a drug deal carried out with a gun. A defendant manifests that greater intent, and incurs the greater liability of §924(c), when he chooses to participate in a drug transaction knowing it will involve a firearm; but he makes no such choice when that knowledge comes too late for him to be reasonably able to act upon it.[10]

## III

Under these principles, the District Court erred in

_____

[10] Contrary to the dissent's view, see *post*, at 3–4, nothing in this holding changes the way the defenses of duress and necessity operate. Neither does our decision remotely deny that the "intent to undertake some act is . . . perfectly consistent with the motive of avoiding adverse consequences which would otherwise occur." *Post,* at 5. Our holding is grounded in the distinctive intent standard for aiding and abetting someone else's act—in the words of Judge Hand, that a defendant must not just "in some sort associate himself with the venture" (as seems to be good enough for the dissent), but also "participate in it as in something that he wishes to bring about" and "seek by his action to make it succeed." *Nye & Nissen* v. *United States*, 336 U. S. 613, 619 (1949) (quoting *Peoni*, 100 F. 2d, at 402). For the reasons just given, see *supra,* at 13, 15–16, we think that intent standard cannot be satisfied if a defendant charged with aiding and abetting a §924(c) offense learns of a gun only after he can realistically walk away—*i.e.,* when he has no opportunity to decide whether "he wishes to bring about" (or make succeed) an *armed* drug transaction, rather than a simple drug crime. And because a defendant's prior knowledge is part of the intent required to aid and abet a §924(c) offense, the burden to prove it resides with the Government.

instructing the jury, because it did not explain that Rose-
mond needed advance knowledge of a firearm's presence.
Recall that the court stated that Rosemond was guilty of
aiding and abetting if "(1) [he] knew his cohort used a
firearm in the drug trafficking crime, and (2) [he] know-
ingly and actively participated in the drug trafficking
crime." App. 196. We agree with that instruction's second
half: As we have explained, active participation in a drug
sale is sufficient for §924(c) liability (even if the conduct
does not extend to the firearm), so long as the defendant
had prior knowledge of the gun's involvement. See *supra,*
at 9, 11–13. The problem with the court's instruction
came in its description of that knowledge requirement. In
telling the jury to consider merely whether Rosemond
"knew his cohort used a firearm," the court did not direct
the jury to determine *when* Rosemond obtained the requi-
site knowledge. So, for example, the jury could have
convicted even if Rosemond first learned of the gun when
it was fired and he took no further action to advance the
crime. For that reason, the Government itself describes
the instruction's first half as "potentially misleading,"
candidly explaining that "it would have been clearer to
say" that Rosemond had to know that his confederate
"'would use' [a firearm] or something . . . that makes
absolutely clear that you [need] foreknowledge." Tr. of
Oral Arg. 48–49. We agree with that view, and then some:
The court's statement failed to convey that Rosemond had
to have advance knowledge, of the kind we have described,
that a confederate would be armed. See *supra,* at 13,
15–16.

The Government contends that this problematic instruc-
tion looks more accurate when viewed in context. In
particular, the Government points to the District Court's
prefatory "umbrella instruction" that to aid or abet a
crime, a defendant must "willfully and knowingly seek[ ]
by some act to help make the crime succeed." App. 196;

Brief for United States 49. That statement, the Government rightly notes, "mirrors" Judge Hand's classic formulation. Tr. of Oral Arg. 33; see *supra,* at 11. But the statement is also pitched at a high level of generality. Immediately afterward, the District Court provided the jury with the two-pronged test noted above—thus indicating how the broad principle should apply to the specific charge of abetting a §924(c) offense. We therefore do not see how the "umbrella" statement could have cured the court's error. Indeed, a different contextual feature of the case would only have amplified that mistake. As earlier described, the prosecutor asserted in closing argument that the court's test was easily satisfied because "a person cannot be present and active at a drug deal when shots are fired and not know their cohort is using a gun." App. 158; see *supra,* at 3–4. The prosecutor thus invited the jury to convict Rosemond even if he first learned of the gun as it was discharged, and no matter what he did afterward. Once again, then, the message to the jury was that it need not find advance knowledge—exactly what we (and for that matter the Government) have said is required.

We send this case back to the Tenth Circuit to consider the appropriate consequence, if any, of the District Court's error. The Government makes two arguments relevant to that inquiry. First, it contends that Rosemond failed to object specifically to the part of the trial court's instructions we have found wanting; thus, the Government asserts, a plain-error standard should apply to his claim. See Fed. Rule Crim. Proc. 52(b); *Johnson* v. *United States*, 520 U. S. 461, 465–467 (1997). Second, the Government argues that any error in the court's aiding and abetting instruction was harmless, because the jury must have found (based on another part of its verdict, not discussed here) that Rosemond himself fired the gun. Those claims were not raised or addressed below, and we see no special reason to decide them in the first instance. See *Travelers*

*Casualty & Surety Co. of America* v. *Pacific Gas & Elec. Co.*, 549 U. S. 443, 455 (2007).  Accordingly, we vacate the judgment below and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–895

_____

## JUSTUS C. ROSEMOND, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[March 5, 2014]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, con-
curring in part and dissenting in part.

I largely agree with the analysis in the first 12 pages of
the opinion of the Court, but I strongly disagree with
the discussion that comes after that point.  Specifically, I
reject the Court's conclusion that a conviction for aiding
and abetting a violation of 18 U. S. C. §924(c) demands
proof that the alleged aider and abettor had what the
Court terms "a realistic opportunity" to refrain from en-
gaging in the conduct at issue.[1]  *Ante*, at 13.  This rule
represents an important and, as far as I am aware, un-
precedented alteration of the law of aiding and abetting
and of the law of intentionality generally.

To explain my disagreement with the Court's analysis, I
begin with our case law on the *mens rea* required to estab-
lish aiding and abetting.  There is some tension in our

_____

[1] I am also concerned that the Court's use, without clarification, of the
phrase "advance knowledge" will lead readers astray.  *E.g., ante,* at 1.
Viewed by itself, the phrase most naturally means knowledge acquired
in advance of the commission of the drug trafficking offense, but this
is not what the Court means.  Rather, "advance knowledge," as used by
the Court, may include knowledge acquired while the drug trafficking
offense is in progress.  Specifically, a defendant has such knowledge,
the Court says, if he or she first learns of the gun while the drug offense
is in progress and at that time "realistically could have opted out of the
crime."  *Ante*, at 15.

cases on this point. Specifically, some of our cases suggest that an aider and abettor must act purposefully or with intent. Prominent among these cases is *Nye & Nissen* v. *United States*, 336 U. S. 613 (1949), which the Court quotes. See *ante*, at 16, n. 10. In that case, the Court, quoting Judge Learned Hand's formulation in *United States* v. *Peoni*, 100 F. 2d 401 (CA2 1938), said that an aider and abettor must "'participate in [the crime] as in something that he wishes to bring about, [and] seek by his action to make it succeed.'" 336 U. S., at 619.

On the other hand, there are cases to which the Court also refers, *ante*, at 12, that appear to hold that the requisite *mens rea* is simply knowledge. See *Pereira* v. *United States*, 347 U. S. 1, 12 (1954); *Bozza* v. *United States*, 330 U. S. 160, 164–165 (1947). The Court refers interchangeably to both of these tests and thus leaves our case law in the same, somewhat conflicted state that previously existed. But because the difference between acting purposefully (when that concept is properly understood) and acting knowingly is slight, this is not a matter of great concern.

Beginning on page 13, however, the Court veers off in a new and, to my mind, most unfortunate direction. The Court imagines the following situation:

> "[A]n accomplice agrees to participate in a drug sale on the express condition that no one brings a gun to the place of exchange. But just as the parties are making the trade, the accomplice notices that one of his confederates has a (poorly) concealed firearm in his jacket." *Ante,* at 15.

If the accomplice, despite spotting the gun, continues to assist in the completion of the drug sale, has the accomplice aided and abetted the commission of a violation of §924(c)?

The Court's answer is "it depends." Walking away, the Court observes, "might increase the risk of gun violence—to the accomplice himself, other participants, or bystand-

ers; and conversely, finishing the sale might be the best or only way to avoid the danger." *Ante*, at 16. Moreover— and this is where the seriously misguided step occurs—the Court says that if the risk of walking away exceeds (by some unspecified degree) the risk created by completing the sale and if the alleged aider and abettor chooses to continue for that reason, the alleged aider and abettor lacks the *mens rea* required for conviction. See *ante*, at 16, n. 10.

What the Court has done is to convert what has up to now been an affirmative defense into a part of the required *mens rea*, and this step has very important conceptual and practical consequences. It fundamentally alters the prior understanding of mental states that form the foundation of substantive criminal law, and it places a strange and difficult burden on the prosecution.

That the Court has taken a radical step can be seen by comparing what the Court now holds with the traditional defense of necessity. That defense excuses a violation of law if "the harm which will result from compliance with the law is greater than that which will result from violation of it." 2 W. LaFave, Substantive Criminal Law §10.1, p. 116 (2003) (hereinafter LaFave).[2] This is almost exactly the balance-of-risks calculus adopted by the Court, but under the traditional approach necessity is an affirmative defense. See, *e.g., United States* v. *Bailey*, 444 U. S. 394, 416 (1980). Necessity and the closely related defense of duress are affirmative defenses because they almost invar-

—————

[2] Traditionally, the defense of necessity was employed when natural forces created the situation justifying non-compliance; when the situation was the product of human action, duress was the appropriate defense. 2 LaFave §10.1(a), at 116. But "[m]odern cases have tended to blur the distinction between" these two defenses, *United States* v. *Bailey*, 444 U. S. 394, 410 (1980), and "it would doubtless be possible to treat [duress] as a branch of the law of necessity," 2 LaFave §10.1(b), at 121.

iably do not negate the *mens rea* necessary to incur criminal liability. See 2 LaFave §10.1(a), at 118 ("The rationale of the necessity defense is not that a person, when faced with the pressure of circumstances of nature, lacks the mental element which the crime in question requires"); *id.*, §9.7(a), at 73 (same for duress).

This Court has made clear that, except in narrow circumstances, necessity and duress do not negate the *mens rea* required for conviction. In *Dixon* v. *United States*, 548 U. S. 1 (2006), the defendant was charged with "knowingly" and "willfully" committing certain criminal acts, but she claimed that she committed the acts only because her boyfriend had threatened to kill her or hurt her daughters if she did not do so. *Id.*, at 4. She contended that she could not "have formed the necessary *mens rea* for these crimes because she did not freely choose to commit the acts in question," but we rejected that argument, explaining that "[t]he duress defense, like the defense of necessity . . . , may excuse conduct that would otherwise be punishable, but the existence of duress normally does not controvert any of the elements of the offense itself." *Id.*, at 6. In a footnote, we suggested one situation in which the prosecution might be required to disprove duress, namely, where a particular crime demands proof that the accused acted "maliciously," which is to say "without justification or excuse." *Ibid.*, n. 4 (internal quotation marks omitted).

The Court justifies its holding on the ground that the *mens rea* standard articulated in *Nye & Nissen* also falls within an exception to the general rule that proof of necessity or duress does not negate *mens rea*. *Ante*, at 16, n. 10. But the Court, having refrained on pages 11–12 of its opinion from deciding whether aiding and abetting requires purposeful, as opposed to knowing, conduct, quickly and without explanation jettisons the "knowing" standard and concludes that purposeful conduct is needed. This is a critical move because if it is enough for an alleged aider

and abettor simply to know that his confederate is carrying a gun, then the alleged aider and abettor in the Court's hypothetical case (who spots the gun on the confederate's person) unquestionably had the *mens rea* needed for conviction.

But even accepting the *Nye & Nissen* standard as the exclusive means of proving the required *mens rea*, the Court's analysis is still quite wrong. Under the *Nye & Nissen* standard, the Government must simply prove that a defendant had as his conscious object that the hypothetical drug sale (which, as the defendant knew, included the carrying of a gun by one of the participants) go forward to completion. See *Nye & Nissen*, 336 U. S., at 619. Such intent is perfectly consistent with facts supporting a necessity or duress defense. A person can certainly intend the success of a criminal enterprise that he aids on the belief that doing so will give rise to a lesser evil than his refusal to participate would bring about.

The Court confuses two fundamentally distinct concepts: intent and motive. It seems to assume that, if a defendant's *motive* in aiding a criminal venture is to avoid some greater evil, he does not have the *intent* that the venture succeed. But the intent to undertake some act is of course perfectly consistent with the motive of avoiding adverse consequences which would otherwise occur. We can all testify to this from our daily experience. People wake up, go to work, balance their checkbooks, shop for groceries— and yes, commit crimes—because they believe something bad will happen if they do not do these things, not because the deepest desire of their heart is to do them. A person may only go to work in the morning to keep his or her family from destitution; that does not mean he or she does not intend to put in a full day's work. In the same way, the fact that a defendant carries out a crime because he feels he must do so on pain of terrible consequences does not mean he does not intend to carry out the crime. When

Jean Valjean stole a loaf of bread to feed his starving family, he certainly intended to commit theft; the fact that, had he been living in America today, he may have pleaded necessity as a defense does not change that fact. See V. Hugo, Les Misérables 54 (Fall River Press ed. 2012).

Common-law commentators recognized this elementary distinction between intent and motive. As Sir James FitzJames Stephen explains, if "A puts a loaded pistol to B's temple and shoots B through the head deliberately, . . . . [i]t is obvious that in every such case the intention of A must be to kill B." 2 A History of the Criminal Law of England 110–111 (1883). This fact "throws no light whatever on A's motives for killing B. They may have been infinitely various. . . . The motive may have been a desire for revenge, or a desire for plunder, or a wish on A's part to defend himself against an attack by B, . . . or to put a man already mortally wounded out of his agony." *Id.*, at 111. "In all these cases the intention is the same, but the motives are different, and in all the intention may remain unchanged from first to last whilst the motives may vary from moment to moment." *Ibid.*

Unsurprisingly, our cases have recognized that a lawful motive (such as necessity, duress, or self-defense) is consistent with the *mens rea* necessary to satisfy a requirement of intent. In *Martin* v. *Ohio*, 480 U. S. 228 (1987), we considered whether due process permitted the State of Ohio to place the burden of proving self-defense on a defendant charged with aggravated murder. Under the Ohio statute, aggravated murder consisted of "purposely, and with prior calculation and design, caus[ing] the death of another." *Id.*, at 230 (alteration in original; internal quotation marks omitted). Martin pleaded self-defense, which required her to prove that (1) she was "not at fault in creating the situation giving rise to the argument" with the victim, (2) she "had an honest belief that she was in

imminent danger of death or great bodily harm, and that her only means of escape from such danger was in the use of . . . force," and (3) she "did not violate any duty to retreat or avoid danger." *Ibid.* Martin argued that due process did not permit the State to impose the burden of proving self-defense on her, because proving self-defense would necessarily negate the elements of aggravated murder, which the State was required to prove beyond a reasonable doubt. We disagreed, explaining that the elements which the State was required to prove to convict Martin were not the same as the elements which Martin was required to prove to prevail on her self-defense theory. *Id.*, at 233. By so holding, we recognized that a defendant's purpose to kill another is not incompatible with that defendant's "honest belief that she was in imminent danger of death or great bodily harm" and that her use of force was necessary to preserve her life. *Id.*, at 230. In other words, the fact that a defendant intends to kill another only to avert mortal peril does not mean that the defendant does not intend to kill.

That principle plays out in a wide variety of cases. *United States* v. *Leal-Cruz*, 431 F. 3d 667 (CA9 2005), provides a good example. There, the Ninth Circuit had to decide whether a defendant could constitutionally be required to bear the burden of proving duress as a defense to conviction under 8 U. S. C. §1326 for attempted illegal reentry into the United States. Leal-Cruz pleaded duress, testifying that he entered the United States only to escape the deadly threat posed by abusive Mexican police officers who were chasing him. 431 F. 3d, at 669. The Ninth Circuit had earlier held that the *mens rea* required for conviction for attempted illegal reentry was "purpose, i.e., conscious desire, to reenter the United States." *Id.*, at 671. The Court of Appeals nevertheless found that the Constitution permitted imposition of the burden of proving duress on Leal-Cruz, because proving duress did not re-

quire him to prove that he had not purposely entered the
United States. As the Ninth Circuit explained, duress and
the *mens rea* requirement of intent did not overlap be-
cause Leal-Cruz "had the 'conscious desire' to enter the
country, even if the act of crossing the border was done to
escape harm." *Id.*, at 673.

Thus, it seems inarguable to me that the existence of
the purpose or intent to carry out a crime is perfectly
compatible with facts giving rise to a necessity or duress
defense. Once that proposition is established, the Court's
error is readily apparent. The Court requires the Gov-
ernment to prove that a defendant in Rosemond's situa-
tion could have walked away without risking harm greater
than he would cause by continuing with the crime—
circumstances that traditionally would support a necessity
or duress defense. It imposes this requirement on the
Government despite the fact that such dangerous circum-
stances simply do not bear on whether the defendant
intends the §924(c) offense to succeed, as (on the Court's
reading) is required for aiding and abetting liability.

The usual rule that a defendant bears the burden of
proving affirmative defenses is justified by a compelling,
commonsense intuition: "[W]here the facts with regard to
an issue lie peculiarly in the knowledge of a party, that
party is best situated to bear the burden of proof." *Smith*
v. *United States*, 568 U. S. ___, ___ (2013) (slip op., at 6–7)
(quoting *Dixon*, 548 U. S., at 9; alteration in original
and internal quotation marks omitted). By abandoning
that rule in cases involving aiding and abetting of §924(c)
offenses, the Court creates a perverse arrangement
whereby the prosecution must prove something that is
peculiarly within the knowledge of the defendant. Imag-
ine that A aids B in committing a §924(c) offense and
claims that he only learned of the gun once the crime had
begun. If A had the burden of proof, he might testify that
B was a hothead who had previously shot others who had

crossed him.  But under the Court's rule, the prosecution, in order to show the intent needed to convict A as an aider and abettor, presumably has the burden of proving that B was not such a person and that A did not believe him to be.  How is the prosecution to do this?  By offering testimony by B's friends and associates regarding his peaceful and easygoing nature?  By introducing entries from A's diary in which he reflects on the sense of safety he feels when carrying out criminal enterprises in B's company?  Furthermore, even if B were a hothead and A knew him to be such, A would presumably only be entitled to escape liability if he continued with the offense *because of* his fear of B's reaction if he walked away.  Under the Court's rule, it is up to the Government to prove that A's continued participation was not on account of his fear of B—but how?  By introducing footage of a convenient security camera demonstrating that A's eyes were not wide with fear, nor his breathing rapid?

The Court's rule breaks with the common-law tradition and our case law.  It also makes no sense.  I respectfully dissent from that portion of the Court's opinion which places on the Government the burden of proving that the alleged aider and abettor of a §924(c) offense had what the Court terms "a realistic opportunity" to refrain from engaging in the conduct at issue.